Honorable, the judges of the United States Court of Appeals for the 8th Circuit. Hear ye, hear ye, hear ye, the United States Court of Appeals for the 8th Circuit is now in session. All persons having business before this Honorable Court may now draw near and they will be heard. God save the United States and this Honorable Court. Very well. Good morning. Thank you to all counsel for joining us for this argument session. Madam Clerk, would you please call the first case for argument. First case for argument, case number 20-2662, Musla Salat v. Merrick B. Garland. All right, Mr. King, we'll hear from you first. Thank you, Your Honor. May it please the Court. My name is Martin King. I'm from Perkins Coie and I'm here on behalf of the petitioner, Musla Salat. Before I begin, I would like to reserve three minutes of time for rebuttal. Well, you'll have to watch the clock and stop on your own if you wish to reserve any time. Okay, understood. Thank you. The BIA mischaracterized the immigration judge's opinion and in so doing, failed to properly review the opinion for clear error. The immigration judge found, quote, in an IDP camp or an institution, respondents' mental illness and volatile behavior will make him susceptible to an array of abuses. The BIA missed the finding about torture in an IDP camp, focusing instead on the strawman of eviction, which the immigration judge had discussed only to illustrate that the Somali government acquiesces to torture in IDP camps. This was error. Now, the government acknowledges that the BIA might have erred, but tries to avoid a remand by arguing that Mr. Salat would not be tortured because Somalis intend to help their victims when they chain people with mental illness, burn them, or lock them in cages with hyenas. This definition of torture would read a dangerous moral relativism into the Convention Against Torture, is inconsistent with case law, and should be rejected. Turning first to the risk Mr. Salat will be tortured, the immigration judge unambiguously found that Mr. Salat is likely to be tortured in an IDP camp, regardless of whether he is evicted. That is made clear by three aspects of the opinion. First, the immigration judge referred on multiple occasions to the risk of torture, quote, in an IDP camp. On page 7, the immigration judge observed that Mr. Salat likely had two options for housing, quote, an IDP camp or institutionalization. The judge then found, quote, in an IDP camp or an institution, Mr. Salat is likely to be abused. And on page 10, the immigration judge observed that the Somali government was willfully bind to, quote, the treatment that mentally ill individuals face in institutions and IDP camps. On your quote from page 7, where does the IJ say that there's likely to be torture in an IDP camp? So the immigration judge says in an IDP camp or an institution, Mr. Salat is likely to Mr. Respondent's mental illness or volatile behavior will make him susceptible to an array of abuses, then lists a series of abuses. Yeah. Well, you just, you changed the words and said the judge found it was likely to happen. Yeah. That's not what the, that's not what the judge said. The judge said that the person would be susceptible. But a person can be susceptible and have something likely or have a 30% chance of it happening or a 10% chance. Susceptibility doesn't equate to likelihood, does it? No, it does not. However, the... All right. Well, you are claiming that was a finding of likely torture, so I just wanted to clear that up. If you want to go on to some other place where you think there is such a finding. Yes. Well, the next sentence, so the next sentence is, based on the foregoing, Respondent is more likely than not to experience torture as a form of punishment in Somalia. It is unlikely that the immigration judge was not referring to the preceding sentence and specifically the finding that in an IDP camp or an institution, Respondent is likely that the mental illness and volatile behavior will make him susceptible to an array of abuses. The immigration judge also, when discussing the context in which Mr. Salat might face abuse, did not mention eviction, but did mention IDP camps. On pages eight through nine of the immigration judge's opinion, the immigration judge identified three contexts for torture, private mental institutions, public mental health institutions, and, quote, IDP camps, but no mention of eviction. This focus on IDP camps rather than eviction shows that the immigration judge was primarily concerned with the treatment Mr. Salat would face at the hands of ordinary Somalis in IDP camps, not Al-Shabaab if he were evicted. Third, the structure of the opinion itself shows that eviction was not, as the BIA erroneously believed, a primary scenario for torture that concerned the immigration judge. This analysis has three sections, risk of harm, relocation, and government acquiescence. If you look at the risk of harm section of pages six to seven, you will not find the or Al-Shabaab, but you will find the immigration judge discuss the intense social stigma that people with mental illness face, the social isolation they endure, and the abuse that they suffer. You will also find the immigration judge explicitly conclude that that abuse would befall Mr. Salat in an IDP camp. Now, if you want to find any mention of eviction, you have to go all the way to the section on government acquiescence. Even then, the immigration judge discusses eviction only to illustrate that the Somali government acquiesces to torture in IDP camps. On page eight, the immigration judge writes, and I want to get this right, quote, the Somali government's systematic destruction of IDP camps constitutes willful blindness towards the harm the mentally ill face in each context. With the third context being IDP camps. And on page 10, the immigration judge writes that by evicting people, the Somali government has, quote, demonstrated a willful blindness to the very real risk of torture faced by IDP individuals, continuing the end of the sentence, in IDP camps. These passages show that eviction was not a primary scenario for torture. It was illustrative of government acquiescence. The BIA misconstrued the finding about torture in an IDP, about the discussion of evictions. According to the BIA, the immigration judge found that Mr. Salat was likely to be tortured only if you were, A, institutionalized, or, B, evicted and then tortured by al-Shabaab. Now, we firmly believe Mr. Salat is likely to be evicted. We have explained why in our briefs. But that is beside the point. What matters is that the immigration judge found that Mr. Salat is likely to be tortured in an IDP camp, and that the BIA missed that finding. Did the alien argue this point to the board in response to the department's appeal? No, your honor, but the alien couldn't have... Sorry, continue. I didn't mean to interrupt. Well, you say no. That was my understanding, too. I read the alien's brief filed by Perkins Coie, and there's no mention, as I could tell, of what you're arguing now about torture in a camp. And you say he couldn't have argued it, but why not? If the government says that IJ erred by finding he'd be tortured in a mental institution, or if evicted, why isn't the response, well, even if the government's right, there's no basis to reverse the order because the IJ supposedly found that he'd be tortured in a camp, and the government doesn't even challenge that. But you didn't argue, now what you say is so clear. The reason that we didn't argue that is because our belief is that the immigration judge found what we're saying, that torture is likely in an IDP camp. The mistake was introduced by the government in its brief, where they mischaracterized the immigration judge's opinion as having two scenarios for torture, torture in an institution, or torture via eviction and then at the hands of al-Shabaab. In order to exhaust an issue, Mr. Sawatt was not required to respond to that mischaracterization in the DHS's brief. We believe that that- Why not? Why wouldn't you do that? I mean, otherwise, are you just sandbagging the board and saying, well, we'll let the board go ahead and think we agree that those are the relevant issues, and then we'll go to the Court of Appeals later and say, oh, there was actually another finding that the board never addressed. That's my concern. Why shouldn't the alien have to make the argument to the board? Oh, well- Not as a matter of exhaustion, just as a matter of non-waiver. Well, candidly, I'm not extensively familiar with the exact language of our brief to DHS. Excuse me, the board. But I am fairly certain that our brief accurately characterizes the decision and makes an argument from that decision. I think it's also important to note that, at least as I read the briefs, they're not sort of- It's not the same sort of adversarial, tip-or-tap-like responsiveness that a brief in front of this court might be. It's more like if you've done college debate, you have two constructive speeches. You both present your affirmative argument. The fact that we did not go in detail to every mistake that we believe the government made in its brief should not mean that when the BIA adopts an erroneous interpretation of the immigration judge, then Mr. Szilagyi cannot challenge that. Also, Mr. Szilagyi, the error hadn't occurred until the BIA adopted the government's erroneous interpretation. So this is our first opportunity to make an argument that the BIA erred. Obviously, you can't argue the board erred before the board issues a ruling, but you can argue to the board that the government's argument is insufficient to justify reversal of the immigration judge because you think there's another finding in the immigration judge's decision that is sufficient to sustain the ruling, even if the government is correct on the points it raises on appeal. But you didn't argue that. No, but the BIA still has an independent duty to review the immigration judge's opinion and point out the clear errors in the opinion. Also, I think that this would be a sort of dangerous gotcha for litigants where litigants would feel pressured to respond to every single conceivable argument that the government makes in its brief. Missing a single one means that there's no opportunity for appeal. That isn't what we typically require. There isn't some sort of like we conceded every conceivable argument that we have to be totally exhaustive. There's still a notion that the BIA is going to independently review the record, the immigration judge's position. To take an example, there's a footnote in the government's brief that says that this court can sua sponte consider the intent element of torture. But that is a legal question, not a factual question. We don't address that in our reply brief. We don't think it's material, and we think if the court were to look at the case law, they would find that it's not a correct statement of the law. But we have to pick and choose. We have limited amount of briefing and time and space. So our brief before DHS focused on that narrow issue, on what we believed were core pieces of the immigration judge's opinion that should be affirmed. But the BIA's job is still to review the opinion as a whole, and if they mischaracterize it, we should have the opportunity to object to that error once it occurs. And that sort of leads me to... Well, I'm not familiar with this idea that proceedings before the board are more like college debate than they are like adversarial litigation in the courts. Is there any authority for that? I didn't understand the board to be like the Social Security Administration where it has a duty to go independently review the record. I thought it was an adversarial proceeding. Particularly when you have a big law firm representing the alien. Is that correct or not? But, for instance, there isn't a reply brief. It's not sort of structured in the same way where it's conceived that every single issue will be exhausted entirely by the litigants. I also just think that there is a particular injustice to the BIA, the immigration judge squarely finding that Mr. Slott is likely to be tortured in an immigration camp. The government misrepresenting the immigration judge's finding and then Mr. Slott being forced to live in Somalia where he is likely to be tortured because that misrepresentation was not squarely pointed out, even if it's implicitly rebutted by the brief that talks about the immigration judge's opinion, that he should be forced to live in Somalia because of that. Counsel, just so I can be clear, can you succinctly state in so many words the misrepresentation that you're referring to? Yes. The government argued that the immigration judge's opinion was based on two scenarios of torture. I see I'm nearly out of time, but two scenarios for torture. One is that the immigration judge, that Mr. Slott would be institutionalized or two, that he would be evicted from an IDP camp and then tortured. The immigration judge, that second scenario is a misrepresentation. The immigration judge's opinion was not based on the scenario of eviction. The immigration judge's opinion was based on the scenario that Mr. Slott would be tortured in an IDP camp, not evicted. Then the BIA adopted that misrepresentation from the government's brief. Thank you. Unless you have further questions. Well, when you say misrepresentation, I'm trying to get a handle on what you... I understand there's a debate about what the immigration judge actually found, but normally that's the sort of thing that would be hashed out in adversarial litigation. If the government says, we think the judge said X and the alien says, no, really the judge found Y, then that would be presented to the board. When you say misrepresent, are you implying some kind of governmental misconduct or do you just mean that you think the government was wrong in its reading of the opinion? No, I'm not implying government misconduct, but I think that the fault for the BIA's decision lies at the party that incorrectly summarizes the immigration judge's opinion, not the party that does not squarely rebut that summary in its page-limited brief. And so I think that this issue is squarely presented to this court. Thank you. All right. Very well. Thank you for your argument. Ms. Glazer, we'll hear from you.  Sherry Glazer appearing on behalf of the United States Attorney General. Your Honors, the government does not dispute that the equities in this case are elevated due to the very grim conditions in Somalia and the fact that Mr. Salat suffers from mental illnesses. But this case, it's based on the law and Mr. Salat has simply failed to produce any evidence showing it's more likely than not he will suffer torture in Somalia under any scenario. Just to address what Mr. Salat's counsel just focused on, an argument that seems to be predicated on a statement or an argument that somehow the immigration judge did not find it's more likely than not that he will be forcibly evicted from an IDP camp. Well, as Judge Colitone pointed out, that was never presented on appeal to the board and they filed the second brief on appeal to the board. They had every opportunity to respond to the government's arguments and they didn't present that on top of the fact that it wasn't presented in either of their briefs. They never argued in their opening brief or their reply brief before this court that somehow that was not a finding that the immigration judge even ever made. So the government would argue that under both scenarios, under failure to exhaust and under waiver, that's simply not before the court. In fact, a lot of his argument focused on the fact that he felt it in fact was more likely than not he would be forcibly evicted from an IDP camp. He made several arguments that he believed it was more likely than not he would be forcibly evicted based on his mental illnesses, based on his membership in a minority clan, but in fact those were not findings the immigration judge made. The immigration judge's finding regarding forced eviction was based on the State Department statistic which explicitly said that 7.85% of individuals are forcibly evicted from IDP camps. That's all it was predicated on. So there's no error with regards to forced eviction overall. And again, the arguments that he's made before this court, he has waived and he also failed to exhaust. He just simply hasn't presented them at all before this argument today. Counsel, why aren't we looking at the aggregate risk? As I read the immigration judge's opinion, it's that he would have a substantial risk of, a likelihood of torture in either, whether he was at the mental health institution or in the camp. And as I read the board's opinion, they really break it down into individual risks. But why aren't we looking at this in the aggregate as the IJ looked at it? Well, I would point to this court's decision in Abdi Omar with regards to that point where this court held that it's not inconsistent to evaluate the aggregate finding with regards to a CAT claim when the board did exactly what it did in this case. That it evaluated the individual findings and found that particular individual findings were in fact flawed which, for lack of a better phrase, brought down the aggregate finding. The immigration judge clearly erred in the finding that it is more likely than not he will be placed in a facility. The aggregate finding of any torture in a facility is flawed and falls as well because if he's not more likely than not going to end up in a facility, no torture is going to happen in a facility. But if the likelihood of where he ends up is an either or, I understand your point. If it were standing alone, you would look at the mental health institution likelihood. But I'm still, at least in this situation, when you've got two places. As I read the IJ, the IJ was saying there's one of two places this person's going to go and maybe the mental health institution isn't as strong a likelihood but don't you have to look at that in combination with the camp itself? If you say it's not likely that he would actually be in a mental health institution, to me that doesn't answer the ultimate question as to the aggregate risk. Even if it's a minor risk, you still have to aggregate it with the camp, don't you? Not in this case because it's two completely separate scenarios. So it made sense for the two completely separate scenarios to be viewed on their own and to be evaluated on their own because he's not going to end up at the same time in both. I agree with you that it's an either or situation. And because of that, they are separately evaluated. And if I could just address the specific torture in an IDP camp, I agree with Judge Colitano that the language in the immigration judge's decision, the immigration judge didn't come out and say it's more likely than not that he's going to suffer harm or abuse that meets the definition of torture in an IDP camp. But I cannot dispute that given the language in the board's decision, it appears it really did not address, should this court find that the immigration judge did find it's more likely than not he will suffer torture in an IDP camp, that the board doesn't appear to address that at all. But there's no reason to remand this case on that basis. And there are a few reasons for that if I could take a few minutes to explain. So in Slaughter on behalf of Slaughter v. Levine, which the government did cite in its brief, this court addressed a similar issue when there was a legal claim that one side argued should be remanded for the district court to address, and the other side said it's not. And this court said because it's a purely legal question, that it can in fact address it because it would serve no useful purpose to pass the issue, thereby probably generating another appeal when the issue is clear and can be resolved on the record before it. And this court in Lassew did hold that this issue, whether an act meets the definition of torture, is purely legal. And this rationale is very applicable to this case for several reasons. So the immigration judge on page 70 in this case, in one single statement, citing the exact same evidence for both conclusions, concluded in one sentence, in an IDP camp or an institution, his mental illnesses and volatile behavior will make him susceptible to abuses by private and government actors that are intended to punish him. And then the immigration judge listed those abuses. And the board addressed that in its decision in the context of a facility when it concluded that he did not show it's more likely than not he will be placed in a facility with a specific intent to torture. Because the record evidence shows that this abuse, that he will suffer, it's through insufficient training, insufficient education, insufficient knowledge, really that individuals in Somalia have no idea, in facilities, how to address and deal with individuals with mental illnesses. They just don't know how to address it. And that's... Counsel, how does that, is there an exception of that sort? I understand your point, but how does that make it, if it otherwise is an intentional act that is focused on the individual person to cause pain or suffering, how does the lack of knowledge make it not torture? Well, because it's not... This court's discussion in Cherico, this is really what this comes down to, is that the test that this court set forth is that the prospective torturer, when performing whatever the deliberate act is, the goal or intent of that act has to be to actually inflict the torture. That if this pain or suffering that is inflicted is a foreseeable consequence of a deliberate act, but it's performed not to specifically torture the person, then that's not enough. If this pain or suffering is... Let me see if I can find the exact wording so I don't misquote what this court said. That if the pain or suffering is... And while you're looking for that, it seems to me that there's a difference between that case which was just sort of a conditions of confinement type of situation where the government, I think it was Haiti, was just unable to maintain facilities that weren't quite unpleasant for those in them. But this is a situation where you've got an individual person and whatever the treating... It is focused directly on that individual. And as I read the record, the intent is to get rid of whatever demons are in that person. And so it's directed at them and it's to cause that demon to get out and that's causing the suffering. It seems to me, can you help me understand why those distinctions aren't relevant here? I'm not sure what you mean by aren't relevant. Well, I mean, I guess I understood you to say this is just like the Haitian custody case. And I'm setting it up to say, well, this is a different situation where you're having an individual treatment provider directly ordering a quote-unquote treatment on an individual person with the intent to put a hyena on them so that that hyena will do whatever it does. That seems to me to be a different factual scenario than conditions of confinement. And I'm asking you, why aren't those differences important distinctions in deciding whether or not this is torture? Well, it is a little bit of a different situation than was presented in Cherico. The Ninth Circuit in Villegas addressed a situation that's more akin to this and held that it was a lack of resources, a lack of knowledge. But my argument would be that, yes, it is different. But the record shows that the intent of these acts is, you know, it's a very jaded way of treatment, that the intent is to treat these people. The intent is not to actually inflict torture on them. And that's the big distinction. So in the record, for example, on page 151, it discusses chaining. And it said that it's an act of desperation. It's not an act of cruelty. And when we look at 686, it discusses chaining also. And it says that the reason chaining is done to individuals with mental illness, it's to contain their aggression. There's a belief that chaining individuals in quiet rooms, it reduces their anger, it reduces agitation, again, reduces aggression. And that chaining, it's done to protect these people from hurting themselves and hurting others. And with regards to... Counsel, what about your opposing counsel makes an analogy to FGM? Is that torture? What I will say about FGM is he cites two cases. He cites Moussa and he cites Mohammed. I have not dealt with cases that address FGM to address whether the specific intent requirement is there. But what I will say is neither of the cases that he cited address that. Neither of them discuss specific intent at all. And he sort of misquotes what the courts did hold in those cases. And Mohammed... Well, what about your view, Counsel? Do you think that FGM could be torture? Qualified as torture? I would argue that I can't dispute that it would rise to the level of torture. But with regards to specific intent, again, I don't know enough about the background of FGM to speak to that, to be honest. I just really don't. And I would say that both the cases that he cites to support that do not support it. Mohammed, the Ninth Circuit said, mutilation of her genitals might be found to fall within the definition of torture as set forth in the regulations. And to the extent that her past genital mutilation did maybe constitute torture, her ongoing experience may be enough to establish she's eligible for cat protection. And remanded the case on that basis. So, again, I can't speak to intent because I don't know enough about it. I haven't seen a record that discusses it. But I would argue that both the cases that he cites, they don't stand for the proposition that, in fact, that both the cases, I believe it was the Ninth Circuit and the Seventh Circuit, said in those cases that there is, in fact, specific intent to inflict torture. That's all that I can speak to on that. And just a few more. Counsel, let me ask you this. It was my understanding that with respect to the mental institutions that exist in Somalia and the availability of those facilities, that there's a more basic problem here. And that is that there are so few facilities, and even the public facility must be paid for by family members. And the petitioner here has very few family members in Somalia. I thought there was a basic issue there that it's not likely, that this person will be institutionalized in Somalia. Am I missing the boat there? No, not at all. The board absolutely was correct in determining that the immigration judge clearly erred in finding that it was more likely than not he will even end up in a mental health facility because of what you mentioned. There are so few facilities in Somalia, and there's not much evidence in the record on how individuals end up in those facilities. But you're absolutely right, Judge Shepard, that the evidence that we have shows that family members place individuals in the facilities, and the family members then pay for the treatment. And according to Mr. Salat's testimony, he has an aunt and a sister in Somalia, neither of whom he knows. He doesn't know where either of them are, and he can't rely on them for support. So there's just no evidence that he falls under any circumstance where he will end up in such a facility. That's absolutely right. If your honors have no other questions, the government would rest on my argument today and on everything we argued in the briefs. And please ask the court to keep in mind that everything Mr. Salat has presented so far in his argument today was not presented to the board and was also not presented in either of his briefs. Thank you very much. Very well. Thank you for your argument. Mr. King, we'll give you two minutes for rebuttal, but please don't go over your time because you've already used all of your time. This is a bonus. Yes. Thank you for that opportunity. I just want to correct the record that this argument that we make about torture is, in fact, in both our opening brief in an IDP campus, in both our opening brief and in our reply brief. On page... Our opening brief's thesis is that the immigration judge did not... or the BIA did not properly assess the aggregate risk of torture that Mr. Salat faces. And on page 19, we explicitly discuss how the immigration judge did not talk about the danger that Mr. Salat faced in and outside an IDP camp. The government knew this argument was coming and was in our brief. That's why they dropped a footnote on page 46 in which they acknowledged that there might be torture in an IDP camp and their recitation of the immigration judge's opinion in their facts section explicitly concedes the immigration judge found in an IDP camp or an institution respondent would face abuse. The entire reply brief is... The reply brief picked up on that footnote because if the immigration judge failed to address that issue, it's our belief that that requires remand... Excuse me, the BIA, that that requires remand back to the board. The reply brief discusses extensively how the immigration... The BIA failed to address this finding, which was plainly made by the immigration judge. Now, that doesn't... That leaves the issue of whether it was properly exhausted before the board. I've made my arguments on that, but I wanted to correct the record that this is, in fact, in our opening brief. It's in our reply. It's the argument we've been... One of the arguments we've been advancing. Thank you. You have the honors. Very well. Thank you to both counsel. The case is submitted and the court will file an opinion in due course. Counselor excused, you may disconnect or remain on the conference as you wish.